IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION NO. |
| JAMES THOMPSON, | 1:19-cr-378-ELR-CMS |
| Defendant. | |

**FINAL REPORT AND RECOMMENDATION**

This case is before the Court on Defendant James Thompson's Motion to Suppress Illegally Obtained Evidence. [Doc. 45].

### I.   BACKGROUND

On September 25, 2019, a Grand Jury sitting in the Northern District of Georgia returned an indictment against Defendant James Thompson ("Defendant") and his wife, April Thompson, alleging that the couple engaged in a conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349. [Doc. 1]. The indictment also alleges ten counts of mail fraud against both defendants, in violation of 18 U.S.C. § 1341. [*Id.*]. The indictment is a "speaking indictment," meaning that it provides some details about the scheme.

The indictment identifies two companies: Forest Investment Associates ("FIA"), described as an Atlanta-based company providing timberland investment

advisory and management services for institutional timberland investors, and Kingwood Forest Services ("Kingwood"), described as a provider of services to timber properties in various states. [Doc. 1 ¶¶ 2, 3]. According to the indictment, FIA retained Kingwood to provide services to timber properties in various states. [*Id.* ¶ 3]. Kingwood hired outside contractors to provide services to FIA properties and then billed FIA for those services. [*Id.*]. April Thompson, who worked for Kingwood as an accounts manager, was responsible for managing the invoices submitted to FIA and requesting payments to contractors. [*Id.* ¶¶ 3, 9]. The couple also operated trucking companies out of their house in Maud, Texas. [*Id.* ¶ 4].

The indictment alleges that during her employment with Kingwood, April sent invoices to FIA for services purportedly, but not actually, performed by Defendant. [Doc. 1 ¶ 6]. The indictment alleges that, "[f]or instance," April sent an invoice in December 2018 for $9,832.50 purportedly for "road grading" services on a FIA property, but Defendant did not perform those services. [*Id.*]. The indictment alleges that as a result of that fraudulent invoice, FIA mailed Defendant a check for $9,832.50, and the check was then deposited into a bank account under James and April Thompson's joint control. [*Id.* ¶ 7]. The indictment also provides examples of how the couple spent the fraudulently obtained funds, which included "making purchases at retail stores, making substantial cash withdrawals, and paying for the

installation of a hot tub and pool at their personal residence." [*Id.* ¶ 8]. Further, the indictment alleges that the couple used April's inside knowledge from her job at Kingwood to keep any fraudulent invoices within the allotted budget, thereby allowing them to escape detection. [*Id.* ¶ 9]. With respect to the mail fraud charges in Counts Two through Eleven, the indictment provides the dates and amounts of ten checks that FIA allegedly sent to Defendant. [*Id.* ¶ 12].

On September 30, 2019, five days after the indictment was returned, federal law enforcement agents applied for a search warrant for the five-acre property where Defendant's home is located, including the residence, garage, shed, and other outbuildings. [Doc. 47-3]. The warrant was supported by an affidavit of Joseph D. Stites, a special agent with the Federal Bureau of Investigation ("FBI"). [Doc. 47-3 at 3–21, "Stites Aff."].

Agent Stites's affidavit is lengthy and detailed. It provides background information regarding the business arrangement between FIA and Kingwood, and it explains that April was responsible for the administrative supervision and payment of contractors for Kingwood. [Stites Aff. ¶¶ 6–9]. In addition to background information, the affidavit also provides information regarding the alleged scheme, specifically:

> 10. On May 14, 2019, FIA attorneys contacted your affiant and reported that APRIL and JAMES THOMPSON had perpetrated a

fraudulent invoicing scheme against FIA. The attorneys alleged that since approximately 2011, APRIL THOMPSON submitted fraudulent invoices to FIA that falsely claimed that JAMES THOMPSON was a KINGWOOD contractor and had provided services on the FIA timber properties that were managed by KINGWOOD. In actuality, JAMES THOMPSON did not provide the services claimed on the invoices and was never engaged as a contractor for either KINGWOOD or FIA. The submission of the fraudulent invoices caused FIA to mail checks to JAMES THOMPSON, PO Box 148, Maud, Texas 75567, for services never rendered.

11. "P.W.", who has been a Management Forester for KINGWOOD since 2011, advised that KINGWOOD typically has approximately six contractors that they employ for forestry services, to include spraying, dozer work, tree planting, and road maintenance, and P.W. was very familiar with each of these contractors. P.W. was absolutely certain that JAMES THOMPSON never provided any services for KINGWOOD or FIA on properties that they manage.

12. FIA attorneys report that since 2011, APRIL THOMPSON submitted approximately 426 fraudulent invoices for JAMES THOMPSON to FIA for payment, and FIA paid out approximately $4,097,246. FIA provided your affiant with copies of the 426 fraudulent invoices submitted by APRIL THOMPSON for JAMES THOMPSON. By way of example, on December 1, 2018, APRIL THOMPSON submitted an invoice for $9,832 that was to be paid to JAMES THOMPSON for "road grading" that was purportedly conducted at one of the FIA-managed properties. As a result of this, FIA mailed JAMES THOMPSON a check in the amount of $9,832. FIA and KINGWOOD have confirmed that JAMES THOMPSON did not conduct road grading for this property and that each of the 426 invoices were fraudulent.

13. TEXAR Federal Credit Union (TEXAR) business records show that $3,940,856.90 of the fraudulent FIA checks were deposited into TEXAR checking account XXXXXXS740_79 and TEXAR savings account XXXXXX5740_01. Both APRIL and JAMES THOMPSON are authorized signers on these accounts. Approximately $156,530 of

> the remaining amount from the $4,097,246 in FIA checks was received back in cash in lieu of depositing into the account. I have seen the available TEXAR surveillance videos showing that JAMES THOMPSON, by himself, made six deposits of fraudulent checks from September 2018 through March 2019. APRIL and JAMES THOMPSON were present for two additional deposits of fraudulent checks.

[*Id.* ¶¶ 10–13 (footnote omitted)]. The affidavit states that FIA initiated a civil lawsuit against Defendant and his wife in federal court in Texas and that a receiver has been appointed to manage the trucking companies. [*Id.* ¶ 15].

Finally, the affidavit provides information about the premises to be searched. The affidavit states that the premises includes not only the couple's residence, but also the couple's trucking businesses that are operated out of the premises. [Stites Aff. ¶¶ 14, 18]. The affidavit provides facts showing that law enforcement had reason to believe that they would find gold and silver coins, bars, jewelry, and silverware that had been purchased using the proceeds from the scheme. [*Id.* ¶¶ 14–17]. The affidavit also stated that there was reason to believe that the Thompsons laundered the fraudulently obtained funds through trucking companies operated out of the premises:

> 18.  I also believe evidence of the underlying fraud scheme will be found at the PREMISES as trucking businesses owned by APRIL and JAMES THOMPSON, which are located at the PREMISES, were used to launder the fraudulently obtained FIA proceeds. Texas Secretary of State filings, bank and financing records, and tax returns indicate that

the trucking companies are registered to and operated out of the PREMISES. In addition, A.C. [an employee of James Thompson Transport LLC and friend of APRIL and JAMES THOMPSON] testified in grand jury that the trucking companies are located at the PREMISES.

19. FBI financial analysis has confirmed that the trucking companies, both of which are located at the PREMISES, have been used to launder a portion of the fraudulently obtained proceeds. Approximately $627,100 from the TEXAR accounts where the FIA checks were deposited was withdrawn via certified checks payable to the trucking companies that are registered to the PREMISES. For example, on October 23, 2018, a fraudulent FIA check payable to JAMES THOMPSON in the amount of $183,040 was deposited into the THOMPSONS' TEXAR checking account. Prior to the deposit, the account had a balance of $1,184.41. On the same day of the deposit, four certified checks were purchased from the account, to include checks payable to James Thompson Trucking for $35,000 and $32,000, a check payable to James Thompson Transport for $88,000, and a check payable to Tri-State Pawn for $13,000.

   a. The check payable to James Thompson Trucking for $35,000 was immediately deposited into a Red River Credit Union account in the name of James Thompson Trucking LLC, with location at the PREMISES, and authorized signors being APRIL THOMPSON and JAMES THOMPSON. Prior to the deposit, the account had a balance of $642.50, and after the deposit, several withdrawal transactions were initiated for payments to business operating and financing payments.

   b. The check payable to James Thompson Trucking for $32,000 was immediately deposited into a First National Bank of Hughes Springs in the name of JAMES THOMPSON, doing business as James Thompson Trucking LLC, with location at the PREMISES, and authorized signors being APRIL THOMPSON and JAMES THOMPSON. Prior to the deposit, the account had a balance of $642.50, and after the deposit, several withdrawal

> transactions were initiated for payments to business operating and cash withdrawals.
>
> c. The check payable to James Thompson Transport for $88,000 was immediately deposited into a Red River Credit Union account number XXXXXXX649_2, a checking account, established on July 22, 2016, in the name of James Thompson Transport LLC, with location at the PREMISES, and authorized signors being APRIL THOMPSON and JAMES THOMPSON. Prior to the deposit, the account had a balance of $3,978.00, and after the deposit, several withdrawal transactions were initiated for payments to business operating and financing payments.
>
> 20. From the responses received from the THOMPSON trucking companies, it appears that the companies regularly utilize corporate records such as corporate agreements that would have been drafted on computers. These and other business records would likely be found on computers and electronic devices found within the PREMISES. I believe that even though the court-appointed receiver has now taken over the THOMPSON trucking companies that it is likely that trucking company records that were in existence during the course of the underlying fraud scheme will be found at the PREMISES.

[*Id.* ¶¶ 18–20 (footnotes omitted)]. Special Agent Stites goes on to state that based on his actual inspection of evidence related to the investigation, he was aware "that computer equipment was used to generate, store, and print documents used by the THOMPSON trucking companies, which were used to launder money from this scheme," and that there was "reason to believe that there is a computer system currently located on the PREMISES." [*Id.* ¶ 22(e)].

United States Magistrate Judge Caroline M. Craven signed the warrant, which authorized the search of the Thompsons' residence, along with the other buildings

located on the property. [Doc. 47-2]. The warrant authorized the seizure of "[a]ll records relating to violations of Title 18, United States Code, Sections 1341 [mail fraud], 1343 [wire fraud], 1349 [conspiracy], and 1956 [money laundering], involving JAMES THOMPSON and APRIL THOMPSON, and occurring after January 1, 2011," including, among other things, financial records, business records, records relating to personal expenses, credit cards, identification documents, precious metals, currency, and jewelry. [*Id.* at 6–7]. The warrant specifically authorized the seizure of computers and electronic storage medium that contained any records or information otherwise called for by the warrant. [*Id.* at 8–9]. The warrant defined the word "computer" as follows: "The term 'computer' includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware." [Doc. 47-3 at 17–18].

The warrant was executed on October 1, 2019, at which time law enforcement seized U.S. currency, financial documents, coin collections, journals, receipts, and planners. [Doc. 47-1 at 2]. They also seized seventeen electronic devices: four iPhones, three iPads, four laptop computers, one desktop computer, and five stand-

alone storage drives.  [*Id.*].  Defendant's motion to suppress is limited to the electronic devices seized pursuant to the warrant.[1]

Defendant argues that the affidavit did not contain probable cause to believe that any electronic device connected to the scheme would be found on the premises because the affidavit did not include: (1) facts showing that he or his wife owned a single electronic device or that any such device would be found in their home at the time the warrant was executed; (2) facts showing that electronic devices were used in the scheme, which he describes as a "largely paper-oriented scheme involving in-person check deposits and cash withdrawals"; or (3) a statement from the affiant that, in his training and experience, schemes like the one allegedly executed by the Thompsons necessarily rely on computers and electronic devices.  [Doc. 45 at 9–11].  In a supplemental brief, Defendant asks that all evidence obtained from the devices be suppressed and that the Court hold an evidentiary hearing to determine whether any other evidence—evidence that may have been obtained from his home "while the FBI was illegally searching for such devices"—should also be suppressed.  [Doc. 51 at 1].

---

[1] Defendant does not claim a lack of probable cause to seize paper documents such as financial records, business records, or records relating to personal expenses, and he concedes that "the affidavit describes a largely paper-oriented scheme involving in-person check deposits and cash withdrawals." [Doc. 45 at 11].

## II.  DISCUSSION

"Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). The search warrant affidavit must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted). "[T]he task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant." *United States v. Bushay*, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984)). Finally, courts are not to "interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." *Id.* (citing *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994)); *see also United States v. Robinson*, 62

F.3d 1325, 1331 (11th Cir. 1995) (requiring the reviewer to afford "great deference" to a judicial determination of probable cause).

Applying this legal standard, I conclude that Defendant's motion to suppress should be denied for two independent reasons. First, Special Agent Stites's affidavit contained an ample basis for Judge Craven to conclude that electronic devices would be found at the premises and that those devices would contain evidence of the crimes listed in the warrant. For example, in Paragraphs 18 through 20 of his affidavit, Special Agent Stites stated that: (1) the FBI had subpoenaed documents from Defendant's trucking companies; (2) the companies were located on the premises; (3) the subpoenaed documents showed that the money was being laundered through those companies; and (4) the trucking companies' business records would likely be found on computers and electronic storage medium located at the premises. [Stites Aff. ¶¶ 18–20].

Further, the affidavit provided ample support for Judge Craven's conclusion that such evidence would be found on electronic devices. The affidavit provided detailed, specific evidence of the scheme and of money laundering and noted that the trucking companies' "business records would likely be found on computer and electronic devices found within the PREMISES." [Stites Aff. ¶ 20]. Special Agent Stites stated that based on "actual inspection of other evidence related to this

investigation," he was aware that the trucking companies had computer equipment that was used to generate, store, and print documents connected to the money laundering activities, and that there was reason to believe that a "computer system" was located on the premises. [*Id.* ¶ 22(e)]. Moreover, the word "computer" was defined in the warrant to include, among other things, "mobile phones" and "tablets." [Doc. 47-3 at 17–18].

The fact that the affidavit did not contain a specific fact tied to the agents' (eminently reasonable) belief that Thompson and his wife possessed electronic devices that would be located on the premises does not defeat probable cause. Given the substantial evidence presented in the affidavit, Judge Craven was entitled to use her common sense to determine that evidence of a massive (more than $4 million) fraud scheme perpetuated over multiple years and involving more than four hundred fraudulent invoices would be found at the premises in both paper and electronic form. Moreover, that same common sense would lead her to reasonably conclude that evidence of large personal expenditures using the proceeds from the scheme along with evidence of money laundering activities would also be found at the premises in both paper and electronic form. Even without specific evidence that the couple possessed cell phones, tablets, and other electronic devices at the premises, and even without the typical "training and experience" language, there nevertheless

was a fair probability that evidence of the crimes would be found on the electronic devices at the home.[2]  *See United States v. Anderson*, 367 F. App'x 30, 33 (11th Cir. 2010); *Bushay*, 859 F. Supp. 2d at 1379 (noting that reviewing courts "should not interpret supporting affidavits in a hypertechnical manner").

Second, even if probable cause was lacking with respect to the electronic devices (which it was not), Defendant's motion to suppress should be denied on the basis of the good faith exception to the exclusionary rule articulated by the Supreme Court in *United States v. Leon*, 468 U.S. 897, 922 (1984).  *Leon* held that even if a search warrant is ultimately found to be unsupported by probable cause, the Fourth Amendment will not bar the admission of evidence obtained by law enforcement officers if the officers were acting in reasonable reliance upon the search warrant.

---

[2] To the extent Defendant is arguing that the warrant amounted to a "general warrant" because it authorized the seizure of "electronic devices without regard to ownership, subject matter, or time" [Doc. 45 at 17], this argument fails.  Paragraphs 2 and 3 of Attachment B ("Property to be seized") were both expressly limited.  Paragraph 2 provided for the seizure of electronic devices to those "used as a means to commit the violations described above," and Paragraph 3 begins by stating "[f]or any computer or storage medium whose seizure is otherwise authorized by this warrant."  [Doc. 47-3 at 15–16].  By limiting the seizure of items to those used to violate the specified statutes, the warrant was sufficiently particular to enable the searchers to reasonably ascertain and identify the documents and information authorized to be seized.  *See Signature Pharmacy, Inc. v. Wright*, 438 F. App'x 741, 746 (11th Cir. 2011); *United States v. Harvey*, No. 1:15-cr-53-TWT-RGV-1, 2015 WL 9685908, at *13 (N.D. Ga. Nov. 30, 2015), *adopted by* 2016 WL 109984 (N.D. Ga. Jan. 8, 2016).

*United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002) (citing *Leon*, 468 U.S. at 922). The Eleventh Circuit interpreted *Leon* as follows:

> The *Leon* good faith exception applies in all but four limited sets of circumstances. The four sets of circumstances are as follows: (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*Id.* (internal quotation marks and citations omitted). Here, none of the four *Leon* circumstances is present, and there is no basis to believe the officers executing the warrant acted unreasonably in relying on the warrant. Accordingly, I conclude that the *Leon* good faith exception to the exclusionary rule would apply if the affidavit were found to be lacking. Accordingly, there is no basis for suppression of any of the evidence obtained as a result of the search warrant.

### III. CONCLUSION

For the reasons discussed above, I **RECOMMEND** that Defendant James Thompson's Motion to Suppress Illegally Obtained Evidence [Doc. 45] be **DENIED**.

I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial, other than the ongoing global COVID-19 pandemic. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**SO REPORTED AND RECOMMENDED**, this 5th day of November, 2020.

_____
CATHERINE M. SALINAS
United States Magistrate Judge